**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Christopher and Jane Stratton-Christopher, husband and wife,<br><br>Plaintiffs,<br><br>v.<br><br>Spectra Electrical Services, Inc.,<br><br>Spectra. | No. CV-12-00345-PHX-DGC<br><br>**ORDER** |

Defendant Spectra Electrical Services, Inc. ("Spectra") filed a motion for partial summary judgment on Plaintiffs' hostile work environment and punitive damages claims. Doc. 67. Plaintiffs filed an opposing statement of facts and motion to strike the declaration of Tom Campbell, to which Spectra filed a response. Docs. 74, 77. For the reasons stated below, the Court will grant Spectra's motion for partial summary judgment in part and deny it in part, and deny Plaintiffs' motion to strike. [1]

**I.    Background.**

Plaintiff Robert Christopher was born in Bangkok, Thailand, and is of mixed Thai and Hawaiian race. Doc. 68, ¶ 1; *see* Doc. 74-1 at 5, Dep. of Robert Christopher, at 9, line 21 to 10, line 4. Mr. Christopher worked for Spectra, a commercial electrical contractor, from mid-February 2005 to mid-September 2005, and was rehired as a

---

[1] The parties' requests for oral argument are denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

journeyman electrician on December 22, 2006.  Doc. 68, ¶¶ 2-3, 26-27.  Mr. Christopher was assigned to the ASU Towers project, a two-building dormitory in central Phoenix on July 23, 2007.  *Id.*, ¶¶ 38, 42.  He was promoted to Foreman on March 17, 2008.  *Id.*, ¶ 47.  While working at the ASU Towers, Mr. Christopher's immediate supervisor was Erik White, who became General Foreman of that project on September 10, 2007.  *Id.*, ¶¶ 43, 45-46.

About two months after Mr. Christopher was promoted to Foreman, Mr. White began to address him using racial slurs like "coconut, pineapple, and gook," Native American names like "Navajo, Cochise, and Geronimo," and possibly "slap-a-ho" in place of Mr. Christopher's name – as in, "Hey, coconut, come over here.  I need to talk to you[,]" or "What do you feel like eating today gook?"  *Id.*, ¶¶ 48-56; Doc. 74-1 at 16-17, 20, Dep. of Robert Christopher, at 53, lines 20-21; 55, line 19 to 56, line 15; 57, line 20 to 58, line 18; 65, lines 9-11; 69, lines 2-3.  This happened in the presence of other workers that Mr. Christopher was supervising, Doc. 68, ¶¶ 61, 64-65, and it persisted even after Mr. Christopher told Mr. White he did not find the name-calling funny and asked him to stop.  *Id.*, ¶¶ 63-67.  When Mr. Christopher complained, Mr. White claimed he was just "clowning around."  *Id.*, ¶ 66.

Mr. Christopher continued to work on the ASU Towers with Mr. White as his immediate supervisor until he left for vacation on July 18, 2008.  *Id.*, ¶ 83.  During this time, Mr. White interacted with Mr. Christopher on a daily basis.  *Id.*, ¶ 57.  He did not use slurs every day or in every conversation, but did so more than 30 times during approximately a two-month period before Mr. Christopher left for vacation.  *Id.*, ¶¶ 48, 60, 83.  Mr. Christopher occasionally reciprocated, calling Mr. White – who is Caucasian – names like "honky" and "cracker."  *Id.*, ¶¶ 68-69.

After returning from vacation, Mr. Christopher began working in Spectra's Service Department where he did not report to Mr. White, but only saw him at supervisor's meetings.  *Id.*, ¶¶ 84-86.  Mr. White did not address Mr. Christopher by any racial slurs or discriminatory names at these meetings.  *Id.*, ¶ 87.

1       On October 27, 2008, Mr. Christopher returned to work as a Foreman at the ASU

2   Towers with Mr. White as his supervisor.  *Id.*, ¶¶ 93-96.  According to Mr. Christopher,

3   Mr. White was pleased to have him back and did not call him any names that day.  *Id.*, ¶¶

4   99-100.   After the first day, Mr. White resumed his previous way of addressing Mr.

5   Christopher, saying things like "Hey pineapple, come on.  Let's go check.  See what –

6   how the work's progressing."  *Id.*, ¶ 102; Doc. 74-1 at 27, Dep. of Robert Christopher, at

7   97, lines 8-19.  No one else was present on these occasions, and Mr. Christopher did not

8   complain or ask Mr. White to stop.  Doc. 68, ¶¶ 104-05.

9       Upon his return to the ASU Towers, Mr. Christopher thought the job was in "utter

10  chaos."  Doc. 74-1 at 27, Dep. of Robert Christopher, at 100, lines 6 to 14.  He and Mr.

11  White had a heated exchange in which Mr. Christopher used profanity to describe how he

12  thought the crews were doing, and Mr. White started "ranting and raving" at him about

13  not getting the work done in a timely fashion.  Doc. 68, ¶¶ 106-113.  After this exchange,

14  Mr. Christopher told himself, "I don't need this harassment.  I'm done[,]" and walked off

15  the job.  *Id.*, ¶ 113; Doc. 74-1 at 28, Dep. of Robert Christopher, at 103, line 21 to 104,

16  line 13.  Mr. Christopher contends that Mr. White called him later that day and begged

17  him not to quit, but that when he agreed and reported for work the next morning, Mr.

18  White fired him.  Doc. 68, ¶¶ 117-18.[2]  Elsewhere, Mr. Christopher claims that he quit,

19  explaining that he got "tired of all the comments . . . and how come the job wasn't getting

20  done and all these slurs and stuff."  Doc. 74-1 at 63, Dep. of Robert Christopher, at 244,

21  line 22 to 245, line 5; *see also* Doc. 68, ¶ 136; Doc. 68-7 at 6, Dep. of Frank Cissne, at

22  48, lines 2-20 (Mr. Christopher told a union investigator he had quit).

23      After he was either fired or quit, Mr. Christopher filed a grievance on

24  _____

25      [2] There is some discrepancy as to the timing of these events.  Mr. Christopher's
    narrative of events states that the name-calling resumed approximately a week after he
26  returned to the ASU Towers, and he worked at that location again for about two to three
    weeks.  Doc. 74-1 at 26-27, Dep. of Robert Christopher, at 96, lines 19 to 22; 97, line 6 to
27  98, line 1.  Elsewhere, Mr. Christopher testifies that he returned to the ASU Towers on
    October 27, 2008, walked off the job on October 28, and was terminated on October 29,
28  *see id.* at 24, 43-44, Dep. of Robert Christopher, at 88, lines 1-11; 164 at line 5 to 165 at
    line 9, all in a matter of three days.

1    November 5, 2008 with his union, the International Brotherhood of Electrical Workers

2    ("IBEW").  Doc. 68, ¶ 132.  He also filled out an Intake Questionnaire with the Equal

3    Employment Opportunity Commission ("EEOC") on November 28, 2008, complaining

4    of "racial slurs," and ultimately filed a Charge of Discrimination with the EEOC on

5    December 19, 2008, stating he was "forced to quit due to harassment."  *Id.*, ¶¶ 141-42.

6          The EEOC issued its Determination letter on June 6, 2011, finding "reasonable

7    cause" that Spectra had "violated Title VII when it subjected [Mr. Christopher] to

8    unlawful race and national origin harassment and constructively discharged him."

9    Doc. 74-2 at 30.  Following the EEOC's Determination, Spectra issued a written warning

10   to Mr. White for "improper conduct," required him to read the company Employee

11   Manual, and instituted a corrective action plan to ensure his future compliance.  Doc. 68,

12   ¶ 143.

13         Plaintiffs received a "Right to Sue" letter from the EEOC on November 17, 2011,

14   and initiated this action within 90 days on February 17, 2011.  *See* Docs. 1; 1-1 at 7.

15   **II.    Summary Judgment Standard.**

16         A party seeking summary judgment bears the initial responsibility of informing

17   the district court of the basis for its motion, and identifying those portions of the record

18   which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*

19   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the

20   evidence, viewed in the light most favorable to the nonmoving party, shows that there is

21   no genuine dispute as to any material fact and that the movant is entitled to judgment as a

22   matter of law.  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a

23   party who fails to make a showing sufficient to establish the existence of an element

24   essential to that party's case, and on which that party will bear the burden of proof at

25   trial.  *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of

26   the suit will preclude the entry of summary judgment, and the disputed evidence must be

27   "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

28   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III.   **Discussion.**

Plaintiffs' first amended complaint alleges "racial discrimination, national origin discrimination, disability discrimination, and discriminatory discharge" in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended.   Doc. 38, ¶ 1.   The complaint requests nominal, compensatory, and punitive damages.   Spectra moves for partial summary judgment on Plaintiffs' discrimination claim based on a hostile work environment and on Plaintiff's request for punitive damages.   Doc. 67 at 1.

A.   **Discrimination.**

Title VII provides that an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin."   42 U.S.C. § 2000e-2(a)(1).   "Similarly, § 1981 prohibits [race] discrimination in the 'benefits, privileges, terms and conditions' of employment."   *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008) (quoting 42 U.S.C. § 1981(b)).   A plaintiff may establish a violation of Title VII or § 1981 by proving that discrimination created a hostile work environment. *See e.g. Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (Title VII); *Manatt v. Bank of America, NA*, 339 F.3d 792, 797 (9th Cir. 2003) (§ 1981).

To prevail on his hostile work environment claim, Plaintiff must show (1) that he was subjected to verbal or physical conduct because of his race or national origin; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment.   *Kang v. U. Lim America, Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (internal quotations omitted); *Gregory v. Widnall*, 153 F. 3d 1071, 1074 (9th Cir. 1998).

Spectra does not dispute that Mr. White called Mr. Christopher by racial slurs and other names associated with his actual and perceived race and national origin, and does not dispute that Mr. White's conduct was unwelcome.   Spectra argues that summary judgment is warranted nonetheless because Mr. White's name-calling was neither severe

nor pervasive and therefore is insufficient to support Plaintiffs' hostile workplace claim. Doc. 67 at 4-9.

To determine whether conduct was sufficiently severe or pervasive to violate Title VII, courts look at all the circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *see Oncale v. Sundowner Offshore Serv's*, 523 U.S. 75, 81 (1998); *Vasquez v. County of L.A.*, 349 F.3d 634, 642 (9th Cir. 2004), 349 F.3d at 642. The same analysis applies to race-based claims under 42 U.S.C. § 1981. *Manatt*, 339 F.3d at 797. "The required level of severity or seriousness 'varies inversely with the pervasiveness or frequency of the conduct.'" *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872 (9th Cir 2001) (quoting *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991)). Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Id.*

Spectra argues on the basis of *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (2003), and that court's comparisons to the facts in *Kortan v. California Youth Auth.*, 217 F.3d 1104 (9th Cir. 2000), and *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir. 1990), that the name calling in this case was not severe or pervasive enough to interfere unreasonably with Mr. Christopher's work performance or create an abusive work environment. Doc. 67 at 7-9. The Court finds these cases distinguishable from the facts presented here.

In *Vasquez*, the Ninth Circuit found the plaintiff's claim of continued racial harassment unsupported because it was based only on two racially discriminatory statements – that the plaintiff had a "typical Hispanic macho attitude" and that "Hispanics do good in the field" – made more than six months apart, combined with two second-hand reports of verbal abuse, and two allegedly false performance complaints. 349 F.3d

at 643-44.  In finding that this conduct was not severe or pervasive enough to create an abusive work environment, the court noted that these "few incidents" occurred over the course of more than a year, and only two of them involved racial epithets.  *Id*.

*Vasquez* relied, in part, on the fact that this conduct was less severe than the evidence in *Kortan*, where the plaintiff had failed to prevail on a hostile workplace claim. 349 F.3d at 643-44.  As summarized in *Vasquez* and quoted by Spectra, *Kortan* found no hostile work environment based on sexual harassment where "a supervisor called female employees 'castrating bitches,' 'Madonnas,' or 'Regina' on several occasions in plaintiff's presence; the supervisor called the plaintiff 'Medea'; the plaintiff complained about other difficulties with that supervisor; and the plaintiff received letters at home from the supervisor."  *Id*.  This mere reiteration of culpable facts, however, fails to include the court's reasoning for finding the plaintiff's evidence of a hostile workplace insufficient.  In particular, the Ninth Circuit noted that most of the supervisor's offensive comments were made in a single outburst following a workplace dispute, they were not directed at Kortan, she had not found the supervisor's comments offensive the one or two times he had previously referred to other female employees by those names, and even though the supervisor made "offensive" utterances to Kortan herself, he had not directed any sexual insults to her.  *Kortan*, 217 F.3d at 1110.  Based on this reasoning, the court concluded that "no triable issue exists about whether the conduct was frequent, severe or abusive enough to interfere unreasonably with Kortan's employment."  *Id*. at 1111.

*Vasquez* also looked for comparison to *Sanchez*, 936 F.2d at 1031, 1036, which it summarized as finding "that no reasonable jury could have found a hostile work environment despite allegations that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino."  349 F.3d at 643. Although this summary appears to have been taken from the factual description in the *Sanchez* case, *Sanchez* in fact affirmed the trial court's issuance of a directed verdict for

1   the defense in a bench trial.  *Sanchez*, 936 F.2d at 1036-37.   The Ninth Circuit's

2   discussion in *Sanchez* does not specify what evidence had been presented before the

3   directed verdict was entered, and the Ninth Circuit simply noted that because the trial was

4   to the Court on the Title VII claim in any event, the decision made by the trial judge was

5   essentially the same as the ultimate decision that would have been made in a bench trial.

6   *Id.*  Given the unusual procedural posture of *Sanchez*, the Court is reluctant to draw any

7   conclusions regarding the level of evidence required to avoid summary judgment in a

8   hostile work environment case.

9       Plaintiffs have raised a genuine issue of fact as to whether Mr. White's conduct

10   toward Mr. Christopher was sufficiently severe and pervasive to interfere unreasonably

11   with Mr. Christopher's work performance or create an abusive work environment.

12   Unlike the two instances of racially offensive utterances in *Vasquez* and the instances of

13   sexual harassment in *Kortan* (mostly contained in a single outburst and not directed at the

14   plaintiff), Mr. Christopher testified that Mr. White referred to him by racial slurs at least

15   30 times over a two month period despite Mr. Christopher's objections, and resumed

16   doing so shortly after Mr. Christopher returned to work at the ASU Towers.

17       As Plaintiffs argue, this case is more like *El-Hakem v. BJY Inc.*, 415 F.3d 1068

18   (9th Cir. 2004), where a superior ("Young") insisted on calling the plaintiff by the

19   western name "Manny" rather than his Arabic name.  *El-Hakem*, 415 F.3d at 1071.  El-

20   Hakem repeatedly objected, and when he proposed that Young call him "Hakem" if

21   Mamdouh was too difficult to pronounce, Young instead suggested calling him "Hank."

22   *Id.* at 1073-74.  When El-Hakem also objected to this, Young continued to call him

23   "Manny" once a week at meetings for two months and by email once or twice a month

24   for almost a year.  *Id.* at 1074.  The Ninth Circuit found that even though Young's

25   conduct was not especially severe, a reasonable jury could conclude based on the

26   undisputed frequency and pervasiveness of the unwelcome names that this behavior

27   created a hostile work environment.  *Id.* at 1073-74.

28       Here, as in *El-Hakem*, the name-calling was not limited to a few isolated incidents,

but was part of a regular and ongoing pattern of communication.  In addition, as Plaintiffs argue, the name-calling in this case is stronger evidence of a hostile work environment because, unlike the names "Manny" and "Hank," the names used by Mr. White, including "gook" and "slap-a-ho," are inherently offensive.

Spectra points to evidence to undercut the abusiveness of Mr. White's conduct, including that Mr. Christopher stated that the name-calling only started after Mr. White became comfortable with him, the two played golf together outside of work, Mr. Christopher characterized Mr. White as being a smart Alec and trying to be funny (something Mr. White confirmed when he claimed just to be "joking around with ya"), the name calling was sometimes mutual, and Mr. Christopher testified that he walked off the job due to a combination of Mr. White's questions about his work performance and the slurs.  Doc. 67 at 5-7; *see* Doc. 68, ¶¶ 49-56, 66-70, 114.  Mr. Christopher also testified, however, that he did not think the name-calling was funny, he asked Mr. White to stop, and he was particularly concerned that being called names in front of the workers he was supervising affected his level of respect on the job and impaired his ability to run an effective crew.  Doc. 75 at 6-7; *see* Doc. 74-1 at 17-18, Dep. of Robert Christopher, at 60, line 19 to 61, line 18.  Drawing all inferences in a light most favorable to Plaintiffs, the Court finds the evidence sufficient to present a triable issue of fact as to whether Mr. White's conduct was so frequent and abusive as to alter the conditions of Mr. Christopher's employment and create an abusive work environment.  The Court will deny summary judgment on Plaintiffs' hostile work environment claim.[3]

**B.     Punitive Damages.**

The class of cases in which a § 1981 or Title VII plaintiff may obtain punitive damages is narrow, and the standard Plaintiffs must satisfy to obtain such damages is

---

[3] Defendant makes arguments for the first time in its reply brief based on *Manatt v. Bank of America, NA*, 339 F.3d 792 (9th Cir. 2003).  Doc. 77 at 4.  *Manatt* found insufficient evidence to support a hostile work environment because only two instances of racial harassment were directed at the plaintiff over a two year period, and the actions, though troubling, had not happened repeatedly.  339 F.3d at 799.  *Manatt* does not change the Court's analysis in this case.

higher than the standard for obtaining compensatory damages.   *See* 42 U.S.C. § 1981a(b)(1); *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 534-35 (1999); *Ngo v. Reno Hilton Resort Corp.*, 140 F.3d 1299, 1304 (9th Cir. 1998), *amended by* 156 F.3d 988 (1998) ("[W]e join four other circuits that also require plaintiff seeking punitive damages under Title VII to make a showing beyond the level of intentional discrimination required for compensatory damages.").   For a defendant to be liable for punitive damages, the plaintiff must show that it acted "with 'malice or with reckless indifference *to the [plaintiff's] federally protected rights.*'" *Kolstad*, 527 U.S. at 535 (emphasis in original) (quoting 42 U.S.C. § 1981a(b)(1)); *see Ngo*, 140 F.3d at 1301-04; *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1026-27 (9th Cir. 2000).   "The terms 'malice' or 'reckless indifference' pertain to the [defendant's] knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 535.   The defendant "must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable [for] punitive damages." *Id.* at 536; *see Ngo*, 140 F.3d at 1304 ("[T]o be entitled to an award of punitive damages, the plaintiff must demonstrate that the defendant 'almost certainly knew that what [it] was doing was wrongful and subject to punishment.'") (citation omitted).

Plaintiffs base their plea for punitive damages on the assertion that Spectra failed to investigate or interview other employees or to take any remedial action against Mr. White after Mr. Christopher filed his written complaint with the IBEW.  Doc. 75 at 15-16, 18; *see* Doc. 168, ¶ 147.  Spectra argues that it did not know and could not have known of Mr. White's name-calling while it was taking place, and it was not required to take the actions Plaintiffs contend it should have taken after Mr. Christopher was no longer employed.  Doc. 67 at 11, 13.

Spectra points to deposition testimony, undisputed by Plaintiffs, in which Mr. Christopher confirms that he never made Spectra or anyone in authority over Mr. White aware of the name-calling during his employment.  Doc. 67 at 13; *see* Doc. 68, ¶¶ 72-80. Mr. Christopher also testified that Mr. White never used racial slurs or discriminatory

names in front of his superiors.  Doc. 68, ¶ 62.  In light of these undisputed facts, the Court cannot conclude that Spectra's failure to investigate shows that it acted with malice or reckless indifference to Mr. Christopher's federally-protected rights.

Plaintiffs argue on the basis of *Mockler v. Multnohmah County*, 140 F.3d 808, 813 (9th Cir. 1998), *Steiner v. Showboat Operating Company*, 25 F.3d 1459, 1465 (9th Cir. 1994), and *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1999), that an employer has a legal obligation to investigate workplace discrimination claims.  But these cases deal only with the *sufficiency* of an employer's actions in response to complaints that arose during the aggrieved party's employment – something that did not occur in this case.  Moreover, these cases affirm that to hold an employer liable, the plaintiff must first show that the employer either knew or should have known that the discrimination was taking place.  *Mockler*, 140 F.3d at 812 ("to show employer liability for hostile workplace . . . . 'the *plaintiff* must show that the employer knew or should have known of the harassment, and took no effectual action to correct the situation.'") (quoting *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983)) (emphasis added in *Mockler*); *Fuller*, 47 F.3d at 1527 (an employer can only be liable for harassment of which it knows or should know) (citing *Ellison v. Brady,* 924 F.2d 872, 881 (9th Cir. 1991)); *Steiner*, 25 F.3d at 1463 (9th Cir. 1994) (finding that to survive summary judgment, the plaintiff had to show that its employer "*once appraised of [the harassing behavior]*, failed to take adequate remedial and disciplinary action.") (citing *Ellison*, 924, F.2d at 872, 879, 881-83) (emphasis added).

Plaintiffs point to evidence that Spectra's Superintendent Tom Campbell received notice of Mr. Christopher's IBEW and EEOC complaints.  Doc 74, ¶ 72; *see* Doc. 68, ¶ 130.  Plaintiffs do not dispute, however, that this took place after Mr. Christopher either quit – as he reported to the IBEW and EEOC – or was fired.  Thus, Plaintiffs base their punitive damages claim on Spectra's failure to interview Mr. Christopher and other witnesses on the basis of third-party complaints made only after he was no longer an employee and no longer subject to the alleged discrimination.  Doc. 75 at 16-17.

1    Plaintiffs cite no authority for the proposition that an employer has an obligation to
2    investigate complaints made known only to outside parties and only after the aggrieved
3    party is no longer employed.   Given that an employer's remedial action must be
4    "'reasonably calculated to end the harassment,'" *Mockler*, 140 F.3d at 813 (quoting
5    *Ellison,* 924 F.2d at 882), and there was no possibility of ongoing harassment here, the
6    Court cannot conclude that Spectra's alleged failure to investigate shows that it acted
7    with malice or reckless indifference to Mr. Christopher's federally-protected rights.
8    Additionally, Plaintiffs do not dispute that after the EEOC completed its investigation
9    and issued its Determination of reasonable cause, Spectra issued a written warning to Mr.
10   White, required Mr. White to review the Employee Manual, and implemented a
11   Corrective Action Plan.  Doc. 68, ¶ 143.  The undisputed facts in this case do not support
12   an award of punitive damages.  The Court will grant summary judgment to Spectra on
13   this claim. [4]

14        **C.     Plaintiffs' Motion to Strike.**

15        Plaintiffs move to strike paragraph 116 of Spectra's statement of facts because it
16   contains Spectra Superintendent Tom Campbell's testimony about what Mr. White told
17   him and is therefore inadmissible hearsay.  Doc. 74, ¶ 116.  "'Hearsay' means a statement
18   that . . . a party offers in evidence to prove the truth of the matter asserted in the
19   statement."  Fed. R. Evid. 801(c).  Spectra argues that Mr. Campbell's recollection of Mr.
20   White's statements is not offered to show the truth of those statements, but to show that
21   Mr. Campbell was informed that Mr. Christopher had quit and not told that he was fired.

23        [4] Plaintiffs also argue for punitive damages on the basis that Spectra does not
24   enforce its non-discrimination policies.  Doc. 75 at 11-18.  Whether or not Spectra
     enforces these policies is relevant to whether it can overcome the presumption that it is
25   vicariously liable for a hostile workplace created by a supervisor.  *See El-Hakem*, 415
     F.3d at 1074 n. 2 (9th Cir. 2005); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807
26   (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Kolstad*, 527
     U.S. at 545.  Plaintiffs have not argued that Spectra is vicariously liable for punitive
27   damages based on the actions of Mr. White, and the Court need not reach the issue of
     affirmative defenses to determine that punitive damages do not apply to Spectra's alleged
28   failure to investigate.  Because Spectra does not move for summary judgment on the
     basis of its asserted good faith efforts to enforce its non-discrimination policies with
     respect to any of Plaintiffs' other claims, the Court need not address these arguments.

- 12 -

Doc. 77 at 8.  The Court agrees that the statement has value for the purpose of showing Mr. Campbell's state of mind independent of whether or not the statement is true.  The Court will deny Plaintiffs' motion to strike this evidence.

Plaintiffs additionally move to strike the entire declaration of Mr. Campbell because Spectra did not designate Mr. Campbell as a Rule 30(b)(6) witness, and his testimony is within the scope of Plaintiffs' Rule 30(b)(6) Notice of Deposition.  Doc. 74, ¶ 116.  Rule 30(b)(6) allows a party to name a corporation as a deponent by providing a Notice or Subpoena "describ[ing] with reasonable particularity the matters for examination."  Fed. R. Civ. P. 30(b)(6).  The corporation must then designate one or more persons with authority to testify to these matters on its behalf and may set out the specific matters upon which each designee will testify.  *Id.*  This rule does not preclude declarations by individuals other than the Rule 30(b)(6) deponent.

Spectra acknowledges that parts of Mr. Campbell's testimony touch on one subject of Plaintiff's Rule 30(b)(6) Notice – "the circumstances of Plaintiff's separation from employment with Defendant" – but argues that striking Mr. Campbell's declaration would be inappropriate for a number of reasons.  These include that (1) Mr. Campbell was no longer a Spectra employee at the time of Plaintiffs' Rule 30(b)(6) Notice and therefore no longer had any authority to speak on behalf of the corporation; (2) when Plaintiffs found the testimony of Spectra designee John Brunia inadequate on two subjects, the Court allowed Spectra to designate Stephen Land to testify regarding those subjects, and Plaintiffs did not complain thereafter that the testimony of Spectra designees Mr. Brunia and Mr. Land were inadequate for any reason;[5] (3) Plaintiffs were aware from Spectra's initial disclosure statement that Mr. Campbell had relevant, discoverable information and could have deposed him; and (4) there is no authority to support Plaintiffs' position that Spectra cannot offer other testimony within the scope of

---

[5] At a telephonic hearing held on January 25, 2013, Plaintiffs objected that Spectra President John Brunia lacked knowledge of two matters within the scope of their Rule 30(b)(6) Notice – Spectra's anti-discrimination  policy and the separation of employment of Erik White.  Doc. 54.  The Court ordered that Plaintiffs could depose a second Spectra designee, Stephen Land, on these subjects at Spectra's expense.  *Id.*

the Rule 30(b)(6) Notice, though that testimony is subject to impeachment by its Rule 30(b)(6) designees at trial. *Id.* at 9-11 (citing 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2103, n.25 (3d ed. 2010)).

Plaintiffs have not filed a reply, and the time for doing so has expired. *See* LRCiv 7.2(d). The Court finds for the reasons argued in Spectra's response that Plaintiffs have failed to present sufficient grounds to strike the declaration of Mr. Campbell. Although a company has an obligation to prepare its Rule 30(b)(6) witnesses, and it may not offer a new or different account of the facts at trial that could have been made known at the time of a Rule 30(b)(6) deposition (*see e.g., Consol. Rail Corp. v. Grand Trunk W. R.R. Co.*, 853 F.Supp.2d 666, 670 (E.D. Mich. 2012); *Rainey v. Am. Forest and Paper Ass'n, Inc.*, 26 F.Supp.2d 82, 94 (D. D.C. 1998) (cited in 8A Charles Alan Wright et al., Federal Practice and Procedure § 2103, n. 25)), Plaintiffs have not pointed to any portions of Mr. Campbell's declaration that address matters on which they were unable to question Spectra's Rule 30(b)(6) designees, on which those designees ultimately lacked knowledge, or on which Mr. Campbell presented new or conflicting information on behalf of the company. Plaintiffs have also not argued that Spectra failed to make sufficient disclosures during discovery that would have allowed them to depose Mr. Campbell themselves; nor would Rule 30(b)(6) have precluded them from doing so. Moreover, as with any other evidence, Spectra's Rule 30(b)(6) testimony and Mr. Campbell's testimony can be contradicted or used for impeachment purposes at trial. *See* 8A Charles Alan Wright et al., Federal Practice and Procedure § 2103, n. 25. The Court will deny Plaintiffs' motion to strike the declaration of Mr. Campbell.

**IT IS ORDERED:**

1. Defendant Spectra Electrical Services, Inc.'s motion for partial summary judgment (Doc. 67) is **granted** with respect to Plaintiffs' punitive damages claim and **denied** with respect to Plaintiffs' hostile workplace claim.

2. Plaintiffs' motion to strike the declaration of Tom Campbell (Doc. 74) is **denied**.

3.      The Court will set a final pretrial conference by separate order.

Dated this 19th day of June, 2013.


_____
David G. Campbell
United States District Judge